AO 91 (Rev. 11/11) Criminal Complaint

| LODGED |
|---|
| CLERK, U.S. DISTRICT COURT |
| 4/15/2021 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: eva DEPTUTY |

# UNITED STATES DISTRICT COURT
for the
Central District of California

| FILED |
|---|
| Apr 15, 2021 |
| CENTRAL DISTRICT OF CALIFORNIA |
| SOUTHERN DIVISION AT SANTA ANA |
| BY Nancy Boehme |
| Deputy Clerk, U.S. District Court |

UNITED STATES OF AMERICA,

    Plaintiff,

v.

DAVID KALANI GARDNER,

    Defendant.

Case No.    8:21-mj-00260-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about **March 15, 2021**, in the County of Orange, within the Central District of California, the above-named defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Ammunition |

This criminal complaint is based on these facts:

☒ Continued on the attached affidavit.

/s/
Complainant's Signature

Hercules Fandino, ATF Special Agent
Printed Name and Title

Attested to by the applicant via telephone in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: April 15, 2021

**DOUGLAS F. McCORMICK**
Judge's Signature

City & State: Santa Ana, California

Douglas F. McCormick, U.S. Magistrate Judge
Printed Name and Title

AUSA: Robert J. Keenan // (714) 338-3597

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Hercules Fandino, being duly sworn, declare and state as follows:

## INTRODUCTION

1. I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since June of 2007. I am currently assigned to the ATF Los Angeles Field Division, Santa Ana Field Office. I am charged with investigating violations of federal arson, explosives and firearm laws and regulations. I regularly refer to these laws and regulations during the course of my official duties.

2. In the course of my employment as an ATF Agent, I have assisted in and conducted numerous investigations involving criminal street gangs, possession of firearms and/or ammunition by prohibited persons, possession of stolen firearms, possession of machineguns, and the illegal trafficking of firearms and narcotics. As an ATF Agent, I have also participated in numerous federal and state search and arrest warrants involving individuals engaged in unlawfully possessing and trafficking firearms and narcotics. I am a graduate of the Criminal Investigator Training Program instructed at the Federal Law Enforcement Training Center and have completed specialized training at the ATF National Academy in the fields of arson, explosives, and firearms.

## PURPOSE OF AFFIDAVIT

3. This affidavit is made in support of a criminal complaint and arrest warrant for **DAVID KALANI GARDNER** ("GARDNER") for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of Ammunition.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## PROBABLE CAUSE

5. I have reviewed the report of Officer Mavritsakis of the Fountain Valley Police Department ("FVPD"), Incident Report #21-07781, regarding the traffic stop and subsequent investigation that led to the arrest of DAVID KALANI GARDNER on March 15, 2021 for narcotics and firearms violations. I have also talked with Officer Mavritsakis about the incident. I have also conducted certain investigative steps noted herein as part of my review of this matter. Based on these efforts, I have learned the following facts:

**A.   Traffic Stop on SUV for Expired Registration**

6. On the evening of March 15, 2021, at approximately 11:16 p.m. (2316 hours), FVPD Officer Mavritsakis conducted a

2

traffic stop of a white Ford Explorer SUV after a DMV records check revealed that the vehicle's registration expired on September 2, 2020.  After the officer activated his patrol vehicle's emergency lights, the driver of the vehicle continued driving southbound on Harbor Boulevard for approximately 0.3 miles.  Due to the driver's failure to promptly pull over and stop, the officer activated his patrol vehicle siren.  The driver of the SUV promptly pulled over at that point, near the intersection of Harbor Boulevard and Goodale Avenue.

     7.    After effecting the stop, Officer Mavritsakis found three occupants inside the Ford Explorer SUV: (1) the driver, Timothy South ("SOUTH"); (2) a female passenger, April Matheny ("MATHENY"), who was seated in the right front passenger seat; and (3) GARDNER, who was seated in the left rear passenger seat behind the driver's seat.  The officer asked each occupant to identify themselves.  SOUTH and MATHENY did so first, and a records check on MATHENY revealed that she was wanted on an outstanding warrant for narcotics violations.  GARDNER verbally identified himself falsely as "David Green," with a date of birth of March 15, 1978, and residing in Hollywood.

**B.**    **Consent Search & Identification of GARDNER**

     8.    Other FVPD officers arrived on scene to assist, and Officer Mavritsakis asked all three occupants to exit the SUV.  When "Green" (*i.e.*, GARDNER) exited the vehicle, the officer asked him if it would be okay to search his pockets, and GARDNER replied, "Yeah."  During that search, Officer Mavritsakis found a handgun laser light inside GARDNER's right shorts pocket.

Based on his training and experience, the officer recognized that the handgun laser light was a firearm accessory that slides and locks onto a handgun accessory rail.  Inside GARDNER's back right shorts pocket, the officer found a wallet which contained a California ID card with a photograph depicting "Green" but identifying him by the name "David Gardner," and a different date of birth (March 3, 1978).  GARDNER told the officer that GARDNER lied about his identity and his real name was "David Gardner."

9.   The officer had all three occupants sit on a curb next to the SUV.  They were not handcuffed at that time.

10.  Officer Mavritsakis conducted a records check on GARDNER, and he learned that GARDNER was a convicted felon who was on Post-Release Community Supervision ("PRCS") with the Orange County Probation Department ("OCPB").  Based on my training and experience, I know that a person on PRCS is subject by statute to a search condition.  Specifically, Section 3453 of the California Penal Code provides that, "Postrelease community supervision shall include the following conditions: . . . (f) The person, and his or her residence and possessions, shall be subject to search at any time of the day or night, with or without a warrant, by an agent of the supervising county agency or by a peace officer."

11.  The records check also revealed that GARDNER was wanted on two outstanding warrants, one for a PRCS violation and one for a violation of California Penal Code § 30305(a)(1) (Prohibited Person in Possession of Ammunition).

4

C.  **Search of Vehicle & Discovery of Narcotics and Firearms**

12. The registered owner of the Ford Explorer SUV was determined to be the driver, Timothy SOUTH. Based upon GARDNER's PRCS status, Officer Mavritsakis asked SOUTH if it was okay to look inside his SUV, and SOUTH replied, "Yeah." Officer Mavritsakis then conducted a search of the SUV.

13. During his search of the vehicle, Officer Mavritsakis discovered the following items, which were seized as evidence:

   a.  In the center console, he found a black plastic bag containing approximately 30.5 grams of suspected methamphetamine.

   b.  On the front passenger seat, where MATHENY had been seated, the officer found a glass water pipe, with burn marks and a white residue. The officer recognized the pipe as paraphernalia used to smoke drugs, specifically methamphetamine.

   c.  On the floorboard of the rear passenger area, behind the front passenger seat, the officer found two semi-automatic handguns. The guns were directly across and within arms' reach of where GARDNER had been seated. The handguns were both upright and leaning against each other. Based on the positioning of the handguns, the officer determined that someone intentionally placed the guns in that position. Moreover, the officer noted that, if the vehicle had been moving after the guns were put there, the handguns would not have been able to stay in that position and would have fallen over.

   d.  The first handgun was found to be a privately-made firearm with no serial number (referred to as a "ghost

5

gun"). The officer noted that the gun's slide appeared to be from a Glock firearm, but it's lower-receiver appeared to be of a different brand, not a Glock. The officer found no serial number on the lower-receiver. The magazine was loaded with fourteen (14) rounds of 9mm Luger ammunition.

   e. Based on his training and experience, the officer found that the second handgun was another type of "ghost gun," which was comprised of parts from a Glock firearm and also parts from a BB gun. The officer noted that the slide and barrel appeared to be from a Gen 4 Glock 17, and they had the same serial number ("KGU417"), but the lower-receiver had a different serial number ("AJA034542"). The second gun's magazine was loaded with one round of 9mm Luger ammunition, but the officer noted it was unknown if the gun could be fired.

   f. On the right rear passenger seat, across from where GARDNER had been seated, the officer discovered a black computer bag, which was found to contain, among other things, the following: (1) a Hawaiian Gardens Casino Players Card with GARDNER's name and photograph on it; (2) four cellular telephones, which were all turned on (NOTE: Two of the phones had a message on the front screen noting the name "David Gardner," and the front screen on another phone had GARDNER's name and photo on it.); (3) several plastic bags of suspected methamphetamine, which the officer found to contain a total net weight of approximately 651.5 grams (or 1.44 lbs.) of suspected methamphetamine; and (4) a plastic bag containing a net weight

6

of approximately 49.4 grams (or 1.74 ounces) of suspected heroin.

        g.    Attached to the black computer bag, the officer discovered an Air Jordan handbag, which was found to contain a working digital scale.  The officer noted that drug-traffickers often use such scales to weigh drugs in connection with drug purchases and sales.

        h.    On the rear left passenger seat where GARDNER had been seated, the officer found a black jacket that contained three separate stacks of United States currency.  One stack was in an iPhone box.  The total amount of money is GARDNER's property was approximately $5,251.

        i.    Finally, on the same rear-left passenger seat where GARDNER had been seated, the officer also found a cellular telephone.  That phone was also turned on, and the illuminated front screen showed a message from a sender named "Nikki."  The message had a photo of a semi-automatic handgun and asked, "So what are you looking for?"  The officer interpreted that message as being associated with an advertisement for selling a gun.

**D.**    **Initial Interview of GARDNER**

    14.    The officer spoke privately with GARDNER, who said the following:

        a.    GARDNER said he got into the vehicle because SOUTH and MATHENY were giving him a ride to the Ana Mesa Inn (3597 Harbor Blvd).  MATHENY contacted him on "Messenger," and they were going to take him to the Ana Mesa Inn.  He had all the money inside his jacket because he recently cashed a back

7

payment for EDD.  He received the back pay earlier in the morning and his father took him to Chase Bank to cash his checks.  He intended to use the backpay funds to purchase a "Denali" car, which was going to cost $3,000.  Even though he had all that money, he does not currently have a job.

        b.   The backpay he received was 8-months' worth of payments.  He said all the money he had was approximately $5,000 and he received eight checks.  When asked why he had money inside the iPhone box, he said the money was wrapped in a $2,000 band but the band broke off.

        c.   When the officer noted that GARDNER was the only person sitting in the back seat when the vehicle was stopped, GARDNER said his only property was his jacket with the money inside and his shirt.  GARDNER said he did not know who the bag belonged which had the drugs.  He said SOUTH and MATHENY picked him up from a tow yard off "First Street."  He said he just got into the car, and the guns or the drugs were not his property.

        d.   When asked about the laser light found inside his shorts pocket, GARDNER said he found the laser light "Right there on the chair" and placed it in his pocket.  He said he thought the laser light was a camera or a "GoPro."

        e.   GARDNER said he still occasionally uses drugs.  He said he was in the car for approximately 20-minutes.  They first stopped at a Taco Bell on Harbor Boulevard.  From Taco Bell, they were going to go to the Ana Mesa Inn.

E.   **Interview of Timothy SOUTH (Driver)**

15.   The officer spoke to Timothy South ("SOUTH"), the driver of the vehicle, privately.  SOUTH stated the following:

a.   He picked up GARDNER 30 minutes prior to being stopped by the officer.  None of the aforementioned items found within the rear seat area of the car was his property.  He did not know there were two loaded guns in the back seat of his car and that when he left earlier that day, the guns were not inside his vehicle.  When he drove earlier in the day, the black bag with all the drugs was not inside his vehicle.

b.   He said he does not think that the guns or black bag belonged to his female associate, April Matheny ("MATHENY").  He said that the guns were not in the car when he picked up MATHENY.  The only property MATHENY had was a bag.

c.   None of the drugs in the car were his property.  As to the suspected methamphetamine found inside his car's center console, SOUTH said he did not know who put the drugs in the center console.  He said, however, that MATHENY did not put the drugs in the center console, and the drugs in the center console did not belong to MATHENY.

d.   There were no drugs in the vehicle when he and MATHENY got inside of it.  He thinks GARDNER brought everything the officer found inside the car.  The guns and the drugs were not SOUTH's property.

e.   When the officer showed SOUTH the black bag where the officer found all the drugs, SOUTH shook his head and stated it was not his bag or MATHENY's bag.

9

**F.   Interview of April MATHENY (Front Passenger)**

16.   The officer spoke privately with MATHENY, the front passenger of the vehicle.  MATHENY stated the following:

    a.   She has known GARDNER for approximately 30 minutes.  They just picked up GARDNER prior to being stopped.  The guns did not belong to her or SOUTH.  She did not know if the guns belonged to GARDNER.  She did not know there were guns in the car.

    b.   After the officer showed her the black bag with all the drugs, MATHENY said it was not her bag.  MATHENY further said she has no idea if the bag belonged to GARDNER.

**G.   Arrest and Subsequent Interview of GARDNER**

17.   GARDNER was arrested for various firearms and narcotics offenses.  MATHENY was cited for possession of methamphetamine and possession of drug paraphernalia, and she was arrested and booked at the County Jail for her outstanding warrants.  SOUTH was cited for possession of methamphetamine and released.

18.   At the FVPD Jail, Officer Mavritsakis advised GARDNER of his Miranda rights per his Officer Handbook.  When asked if he understood those Rights, GARDNER nodded his head up and down indicating, "Yes."  When the officer first started talking with him, GARDNER said he had nothing to say and was "super tired."  When asked about the laser gun light, GARDNER said he did not want to talk about it.  When asked about the guns, GARDNER said, "I don't know anything about them."  He later said that when he got into the car, he found the laser light on the seat.  After

finding it, he placed the laser light into his pocket. GARDNER said he never saw any guns in the car. He said that all of the money he had was backpay EDD money. He denied selling drugs.

19. GARDNER said SOUTH and MATHENY picked him up in the City of Cypress, and they were going to a tow yard to get MATHENY's car. He said he did not really know MATHENY. He said he was only in the vehicle for approximately 20 minutes and never saw any of the property in the back seat of the vehicle.

20. When asked about the bag with all the drugs and asked why his casino ID card was inside the bag, GARDNER said the ID fell out of his jacket pocket and into the bag. He said he took his jacket and shirt off, and he said the ID possibly was inside the jacket pocket and landed inside the bag.

## H.   GARDNER's Criminal History

21. Based on my review of GARDNER'S criminal history, I learned that GARDNER has multiple prior felony convictions, including the following:

   a.   Grand Theft, in violation of California Penal Code ("CPC") § 487(C), in California Superior Court, County of Orange, Case No. 99SF0298, on or about May 13, 1999, for which he was sentenced to 3 years' felony probation and 365 days in jail;

   b.   Assault with a Deadly Weapon - Not a Firearm, in violation of CPC § 245(A)(1), in California Superior Court, County of Orange, Case No. 02SF0721, on or about October 23, 2002, for which he was sentenced to 2 years in prison;

    c. 2nd Degree Burglary, in violation of CPC § 460(B), and Receiving Stolen Property, in violation of CPC § 496(A), in California Superior Court, County of Orange, Case No. 07WF2467, on or about October 26, 2007, for which he was sentenced concurrently to 2 years in prison and 16 months in prison respectively;

    d. Fraud – Criminal Impersonation, in violation of Colorado Revised Statutes § 18-5-113, in Colorado State Court, County of El Paso, Case No. D0212000CR004778, on or about June 12, 2008;

    e. Possession of a Controlled Substance, in violation of California Health and Safety Code ("H&S") § 11350(A), in California Superior Court, County of Orange, Case No. 10CF3315, on or about January 5, 2011, for which he was sentenced to 3 years' felony probation and 180 days in jail initially, and then 16 months in prison;

    f. Possession of Marijuana for Sale, in violation of H&S § 11359, and Possession of a Controlled Substance for Sale, in violation of H&S § 11378, in California Superior Court, County of Orange, Case No. 12HF1961, on or about October 1, 2012, for which he was sentenced concurrently to 32 months in prison for each violation.

    g. Unauthorized Use of a Motor Vehicle, in violation of Oregon Revised Statutes § 164.135, in Oregon State Court, County of Jefferson, Case No. 15CR42640, on or about February 9, 2016;

    h. Possession/Purchase for Sale of a Controlled Substance, in violation of H&S § 11351, Possession of a Controlled Substance for Sale, in violation of H&S § 11378, and False Checks, Records, etc., in violation of CPC § 470(D), in California Superior Court, County of Orange, Case No. 15WF1315, on or about April 24, 2017 and May 3, 2017, for which he was sentenced concurrently to 2 years in prison, 16 months in prison, and 16 months in prison respectively;

    i. Possession of a Controlled Substance for Sale, in violation of H&S § 11378, and Carrying a Concealed Dirk or Dagger, in violation of CPC § 21310, in California Superior Court, County of Orange, Case No. 18NF2551, on or about December 21, 2018, for which he was sentenced concurrently to 2 years in prison for each violation; and

    j. Felon in Possession of Ammunition, in violation of CPC § 30305(A)(1), and Possession of a Weapon at a School, in violation of CPC § 626.10(A)(1), in California Superior Court, County of Orange, Case No. 20HF0971, on or about December 9, 2020, for which he was sentenced to a stayed conviction and 16 months in prison, respectively.

**I. Interstate Nexus**

  22. On April 9, 2021, I forwarded information regarding the fifteen (15) rounds of "FC" and "Speer" ammunition recovered during GARDNER's arrest to ATF SA Jeff Davis, who is an interstate nexus expert.  SA Davis determined that the "FC" ammunition recovered during GARDNER's arrest was manufactured and/or assembled by Federal Cartridge Company, a subsidiary of

Vista Outdoor, in either the State of Minnesota or the State of Idaho, and that because the ammunition was recovered in California, it must have moved in interstate commerce. SA Davis further determined that the "Speer" ammunition recovered during GARDNER's arrest was manufactured and/or assembled by Speer, a subsidiary of Vista Outdoor, in either the State of Idaho or the State of Minnesota, and that because the ammunition was recovered in California, it must have moved in interstate commerce.

## CONCLUSION

23. Based on the foregoing facts, I submit that there is probable cause to believe that DAVID KALANI GARDNER has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of Ammunition.

/s/
HERCULES FANDINO
ATF, Special Agent

Attested to by the applicant
via telephone in accordance
with the requirements of Fed.
R. Crim. P. 4.1 on this day,
April  15 , 2021.

**DOUGLAS F. McCORMICK**
   DOUGLAS F. McCORMICK
UNITED STATES MAGISTRATE JUDGE

14